IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:25-CR-97-D

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>REGINALD EUGENE TILLMAN, )<br>)<br>Defendant. ) | **ORDER** |

On May 6, 2025, a grand jury in the Eastern District of North Carolina issued a two-count indictment against Reginald Eugene Tillman ("Tillman" or "defendant") [D.E.1]. On July 17, 2025, Tillman moved to suppress evidence that law enforcement recovered in a homeless encampment on October 30, 2024 [D.E. 23]. On August 25, 2025, the United States responded in opposition to Tillman's motion [D.E. 33]. On September 5, 2025, Tillman replied [D.E. 37]. The court decides Tillman's motion without an evidentiary hearing because there is no material factual dispute. See Fed. R. Crim. P. 12(c)(1); United States v. Bowman, 106 F.4th 293, 300 (4th Cir. 2024). As explained below, the court denies Tillman's motion to suppress.

I.

On October 30, 2024, at about 3:00 a.m., law enforcement responded to a reported armed robbery at a Circle K convenience store on New Bern Avenue in Raleigh, North Carolina. See [D.E. 23] 1; [D.E. 33] 2. When law enforcement arrived, the store clerk told them the suspect had rushed into the store, jumped the counter, racked the slide of a black handgun, and said, "[G]ive me all the money." [D.E. 33] 2. The clerk said she screamed and ran from the store, where a nearby driver helped her notify law enforcement. See id. The suspect stole $50 from the cash register, about 45 cigarette packs, and the clerk's purse—which contained her wallet and Beretta

9mm firearm. See id. at 2–3. She described the suspect as a light-skinned black male with a small tattoo under his left eye. See [D.E. 23] 1; [D.E. 33] 3. She said he wore a patterned red ski mask, sunglasses, gloves, a black sweatshirt with a light-colored shirt on top, gray sweatpants, and light-colored shoes. See [D.E. 33] 3. The clerk thought she recognized the suspect as someone she knew with dreadlocks but could not tell because of his hood. See id.

Store surveillance footage confirmed that description. See id. Footage showed the suspect in a shirt-covered black sweatshirt, gray sweatpants, a red-and-black-camouflage mask, and blue shoes. See id. He entered the store, jumped the counter toward the clerk, and brandished a black firearm. See id. He took cash from the register and handfuls of cigarette packs, threw them in a trash bag, and went into the back room for the clerk's purse. See id. He fled before law enforcement arrived. See id. at 3.

A Wake County K-9 officer responded to the scene to track the suspect. See id.; [D.E. 23] 2. The K-9 track led past several tents in a homeless encampment to one tent 800 feet behind the Circle K. See [D.E. 23] 2; [D.E. 33] 3. The tent, raised on wooden pallets, sat on a privately-owned vacant lot in a wooded area. See [D.E. 23] 4; [D.E. 37] 2, 17. Law enforcement directed those in the tent to exit with their hands up. See [D.E. 33] 3–4. Six people exited and lined up—four males, including Tillman, and two females. See id.; [D.E. 23] 2; [D.E. 37] 2. Tillman had dreadlocks, wore partially slipped-on shoes, and was sweating profusely despite it being cold outside. See [D.E. 23] 4; [D.E. 33] 4; [D.E. 37] 11. When asked why he was sweating, Tillman said he had been tending the fire outside the tent. See [D.E. 37] 11.

Looking inside the tent, law enforcement observed rows of shoes, clothing piles, and one mattress covered with items. See [D.E. 33] 4. Officer Keaton ("Keaton") did a protective sweep of the tent, saying "I would like to do a quick run-through of the tent to make sure there's no red

ski mask or anything . . . before we cut them all loose." Id. Keaton opened and emptied bags, photographed items, and found a balled-up red face mask in a clothing pile. See [D.E. 23] 2; [D.E. 33] 4; [D.E. 37] 3. He alerted Officer Johnson ("Johnson"), who asked the individuals outside which of them owned an orange ski mask. See [D.E. 33] 4. After delay and silence, Tillman said "I got a red joker one, it's black." Id.; [D.E. 37] 2.[1]

Keaton exited the tent and told Johnson he was unsure about the red mask because he found a few in the tent. See [D.E. 33] 4; [D.E. 37] 3. No one claimed an ownership interest in the tent or described their relation to it. See [D.E. 37] 3. Tillman swayed and was unsteady. See [D.E. 33] 4. Law enforcement detained and cuffed Tillman. See id. They released the five other individuals. See id. at 5.

Keaton told Tillman that he was detained because (1) he matched the description of a suspect involved in a nearby armed robbery and (2) clothing found in the tent matched the suspect's clothing. See id. at 3; [D.E. 33] 5. Keaton told Tillman that law enforcement would search the tent. See [D.E. 33] 4. As Keaton walked toward the tent, Tillman said, "[A]s far as me fitting the description, I know the woman who works there, she knows me, she know my voice and all that." Id. Keaton noticed a small cross tattoo under Tillman's eye. See id. Johnson sent a photograph of the tattoo to officers with the clerk, and the clerk confirmed that the recovered ski mask matched what the suspect wore. See id. While receiving radioed descriptions of the suspect's clothing, Keaton engaged in a 15-minute warrantless tent search for other matching items. See [D.E. 37] 2–3.

Outside, Johnson asked Tillman who owned the mask. See [D.E. 33] 5–6. Tillman said he did not know—he owned a "joker" face mask. See id. Johnson replied, "[Y]ou've never seen

---

[1] The government does not intend to use this statement at trial. See id. at 2, 19.

3

anybody with this one, in the tent?" Id. at 6. Tillman said, "[T]here's a few of them in the tent, my bag is the Nike Air Jordan." Id. Johnson asked if he saw anyone in the tent with that mask and if one of the females had been in the tent all night. See id. Tillman said, "I can't even tell you, I don't know, I ain't even been in the tent myself." Id.

Officer Coates ("Coates") arrived and entered the tent Keaton was searching. See id. Coates said, "Hold on a second, how'd we get in here? Did [Tillman] just come out?" [D.E. 37] 3. Keaton replied, "[Y]eah." Id. Coates said, "We technically might need a search warrant, to be honest with you." Id. Keaton asked, "[Y]ou think?" Id. Coates gave an affirmative, "[M]m-hmm," directing Keaton to leave the tent. Id.

As they stepped out, Keaton said he "lean[ed] towards a public safety concern" because the area was public and there may be two weapons in the tent. [D.E. 33] 6; see [D.E. 23] 4. Tillman began to keel over. See [D.E. 33] 6. Keaton patted him down and noticed gray sweatpants worn under Tillman's black sweatpants. See id. Tillman said, "[S]hit, man." Id. Johnson replied that the officers were trying to understand the situation, because "you see how this looks." Id. Johnson stated that a female from the tent was on store video around the time of the robbery, that Tillman matched the suspect's description, and that officers found a matching mask in the tent. See id. Johnson said, "[Y]ou see why we have to do our due diligence to make sure we know it's not you," and Johnson advised Tillman he was not under arrest. Id. Tillman rambled that "other people have face tattoos" and "the only thing in the tent is [his] Air Jordan backpack," and asked how he matched the description. Id. at 7.

Johnson stepped away to confer with the other officers. See id. Tillman said, "[T]hat's crazy, I was talking to Ashley [the clerk's first name] earlier, she said something happened this afternoon." Id. Johnson replied, "[T]his happened just now." Id. Tillman responded, "[Y]eah I

4

know, I said earlier." Id. Johnson asked, "[W]here, the gas station?" Id. Tillman said, "[Y]eah." Id.

In woods near the tent, officers found blue shoes that matched what the suspect wore. See id. Tillman consented to Johnson checking his sweatpants. See id. Johnson confirmed that Tillman wore gray sweatpants with a Nike logo like those worn by the suspect. See id.

Law enforcement arrested Tillman and walked him to a patrol vehicle. See id. Detective Moreland ("Moreland") read Tillman his Miranda rights and Tillman orally agreed to speak with him. See id.; Miranda v. Arizona, 384 U.S. 436, 469 (1966). Moreland informed Tillman why law enforcement detained him. See [D.E. 33] 7. Tillman denied committing the robbery, claiming he had been in the tent using narcotics at the time. See [D.E. 37] 11. Tillman said repeatedly, "That's not my tent . . . . [T]he only thing that belongs to me in that tent is that Nike Air Jordan backpack." [D.E. 33] 7–8. Tillman also said, "Ashley know me" and "there were a lot of people in that tent," but admitted he was in the Circle K an hour or two before law enforcement reached the tent. Id. Moreland asked Tillman if his DNA was on the tent ski mask. See id. at 8. Tillman claimed one of the tent ski masks. See id. Moreland said, "[T]he one that was worn was very specific." Id. Tillman replied, "[Y]eah the army fatigue one, the red and black," and said he also owned an all-black mask and a "joker face" black mask. Id. Detective LaPenta ("LaPenta") asked, "[H]ow come you have three ski masks in a tent that you don't live in?" Id. Tillman replied, "[B]ecause they was in my bookbag." Id.

LaPenta obtained a search warrant for the tent. See id. In the application affidavit, Lapenta detailed the robbery, surveillance video, suspect description, K-9 track that led directly to the tent, and that Tillman matched the description, was sweating profusely, and wore gray sweatpants that matched those worn by the suspect. See id.; [D.E. 37] 19–20. LaPenta also noted that law

5

enforcement observed a red ski mask, drug paraphernalia, and white powder in the tent,[2] and that Tillman admitted he owned the red ski mask. See [D.E. 33] 8; [D.E. 37] 19–20. When law enforcement executed the search warrant, they recovered:

- **Outside the tent:** A "Green Ozark bag" containing a Palmetto State Armory 9mm pistol, a Beretta 9mm pistol (which the clerk identified as her firearm), and two Raleigh bus passes;

- **On top of the tent:** A "Pokemon Backpack" containing 42 cigarette packs and a register till piece; and

- **Inside the tent:** Blue sneakers and gray pants.

See [D.E. 33] 8; [D.E. 37] 21.

On May 6, 2025, a grand jury in the Eastern District of North Carolina charged Tillman with interference with commerce by robbery in violation of 18 U.S.C. § 1951 (count one) and brandishing a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (count two). See [D.E. 1] 1–2; [D.E. 23] 3. On July 17, 2025, Tillman moved to suppress "all physical evidence, including a facemask, handguns, packs of cigarettes, and any statements made by [Tillman] as a result of the unjustified search and seizure." [D.E. 23] 1.

---

[2] Tillman contests that drug paraphernalia was in plain view. See [D.E. 23] 5–6; [D.E. 37] 6. The government claims that law enforcement at some point recovered "bindles of heroin." [D.E. 33] 12. Because the warrant affidavit provided ample basis for the magistrate's probable cause determination, any mention of narcotics was immaterial. See [D.E. 37] 19–20; District of Columbia v. Wesby, 583 U.S. 48, 57 (2018) ("Probable cause is not a high bar."); Moretti v. Thorsdottir, 157 F.4th 352, 362 (4th Cir. 2025) ("The probable cause bar is a low one . . . ."); cf. Kaley v. United States, 571 U.S. 320, 328 (2014); Maryland v. Pringle, 540 U.S. 366, 371 (2003); Illinois v. Gates, 462 U.S. 213, 241–46 (1983); Franks v. Delaware, 438 U.S. 154, 155–56, 171–72 (1978); Jackson v. Carin, 128 F.4th 525, 534 (4th Cir. 2025); United States v. Glass, __ F.4th __, 2025 WL 3455396, at *4 (4th Cir. Dec. 2, 2025); United States v. Pulley, 987 F.3d 370, 376–77 (4th Cir. 2021); United States v. Moody, 931 F.3d 366, 370–71 (4th Cir. 2019); United States v. White, 850 F.3d 667, 672–73 (4th Cir. 2019); United States v. Lull, 824 F.3d 109, 114–20 (4th Cir. 2016); Miller v. Prince George's Cnty., 475 F.3d 621, 627–28 (4th Cir. 2007), abrogated on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009); United States v. Dickey-Bey, 393 F.3d 449, 454 (4th Cir. 2004); United States v. Colkley, 899 F.2d 297, 300–01 (4th Cir. 1990); United States v. Garrett, __ F. Supp. 3d __, 2025 WL 3161675, at *9–15 (E.D.N.C. Nov. 12, 2025).

6

## II.

Tillman moves to suppress the recovered evidence and any of his accompanying statements as the fruits of an unlawful search and seizure, arguing that he had a reasonable expectation of privacy in the tent and his possessions. See [D.E. 23] 3 ("Tillman had a reasonable expectation of privacy in his residence."); [D.E. 37] 4–5 ("[Tillman's] possessory interest does not require ownership; other evidence establishing possession and control suffices . . . . [His] statements indicate a possessory interest in a number of items inside the tent."). His argument hinges on having a possessory interest in the tent or items inside and the government's protective sweep exceeding its proper scope. See [D.E. 23] 3 (citing Payton v. New York, 445 U.S. 573 (1980), and Maryland v. Buie, 494 U.S. 325, 327 (1990)); [D.E. 37] 4 (citing United States v. Rose, 3 F.4th 722, 730 (4th Cir. 2021)).[3]

In moving to suppress evidence, the initial "burden of proof [falls] upon the defendant." United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981). For "[e]ven where officers conduct an unreasonable search or seizure, only the individual whose Fourth Amendment rights were violated may object." United States v. Green, No. GJH-17-590, 2018 WL 3655914, at *2 (D. Md. Aug. 2, 2018) (unpublished), aff'd, 106 F.4th 368 (4th Cir. 2024). The defendant must show "not only that the search of [the property] was illegal but also that he had a legitimate expectation of privacy" in that property. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); see Rakas v. Illinois, 439 U.S. 128, 143 (1978). Once the defendant meets that burden, the government must "prove the admissibility of the challenged evidence by a preponderance of the evidence." United States v. Gualtero, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014).

---

[3] The government concedes that the 15-minute tent search "likely exceeded the scope of a protective sweep," but claims inevitable discovery. [D.E. 33] 14.

7

Here, the tent sat in a "homeless encampment on private property." [D.E. 33] 12; see [D.E. 37] 17. Coordinates provided in the search warrant affidavit identify privately-owned property. See [D.E. 37] 18; Raleigh iMaps, https://maps.raleighnc.gov/imaps/?pin=1724753316 (last visited Jan. 12, 2026) (listing "BEKEE VENTURES LLC" as property owner since 1972). A person lacks an objectively reasonable expectation of privacy in a place in which his presence is "wrongful." Rakas, 439 U.S. at 141 n.9 (cleaned up). This principle includes squatters and trespassers. See, e.g., United States v. Guzman, 149 F.4th 1132, 1138, 1140 (10th Cir. 2025) (finding homeless man with owner's permission to be in owner's trailer had no standing to challenge trailer search because the trailer was on restricted property unlawfully); United States v. Curlin, 638 F.3d 562, 565 (7th Cir. 2011) ("[I]ndividuals who occupy a piece of property unlawfully have no claim under the Fourth Amendment."); United States v. Struckman, 603 F.3d 731, 747 (9th Cir. 2010) (explaining that defendant's Fourth Amendment claim would fail if the defendant were "an actual trespasser"); United States v. Whitehead, 415 F.3d 583, 587–88 (6th Cir. 2005) (explaining that an "illegal squatter" lacks a legitimate expectation of privacy in the property); United States v. Sanchez, 635 F.2d 47, 64 (2d Cir. 1980) ("[A] mere trespasser has no Fourth Amendment protection in premises he occupies wrongfully."); Amezquita v. Hernandez-Colon, 518 F.2d 8, 11–12 (1st Cir. 1975) (finding no standing where plaintiffs "knew they had no colorable claim to occupy" government-owned land).

The government notes that Tillman disclaimed any possessory interest in the tent. See [D.E. 33] 8, 12. In support, the government cites Tillman repeating, "[T]hat's not my tent," and answering why he had masks "in a tent that you don't live in?" with "because they was in my bookbag." Id. (emphasis added). Tillman responds that his possessory interest does not require ownership, only possession and control, and cites Rose, 3 F.4th at 730. See [D.E. 37] 4. But

8

Case 5:25-cr-00097-D-BM    Document 42    Filed 01/12/26    Page 8 of 13

whichever occupants had a possessory interest in the tent, their apparent trespassing on private property does not give them or Tillman standing to bring a Fourth Amendment challenge. See, e.g., Guzman, 149 F.4th at 1140; Curlin, 638 F.3d at 565; Struckman, 415 F.3d at 587–88; Sanchez, 635 F.2d at 64; Amezquita, 518 F.2d at 11–12.

Alternatively, Tillman urges this court to accept that his statements, which according to him "evidenced an intimate knowledge, and possession of the tent's contents," establish a protected privacy interest. [D.E. 37] 4. Tillman also suggests status as a resident or an overnight or protected social guest. See id. ("The tent was set up as a residence . . . , one in which [Tillman] had an actual expectation of privacy.").

Tillman fails to show a protected privacy interest or status as a resident or an overnight or protected social guest. First, Tillman argues that he resided in the tent—citing his alleged "intimate knowledge" of the tent's interior, that no one else claimed the tent, and that a law enforcement report says he referred to the tent as "his tent." See [D.E. 23] 3; [D.E. 37] 5. The record belies Tillman's argument. Specifically, even if Tillman briefly resided in the tent, he abandoned any interest in the tent when he disclaimed possession to law enforcement. Moreover, the government does not violate the Fourth Amendment when it seizes or searches abandoned property. See Abel v. United States, 362 U.S. 217, 241 (1960). "The law is well established that a person who voluntarily abandons property loses any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property." United States v. Ferebee, 957 F.3d 406, 412 (4th Cir. 2020) (cleaned up); cf. United States v. Small, 944 F.3d 490, 502 (4th Cir. 2019) (stating that an item is not abandoned if defendant "retains a reasonable expectation of privacy in the articles alleged to be abandoned" (cleaned up)). To determine abandonment, courts perform "an objective analysis" and may infer intent to abandon

"from words spoken, acts done, and other objective facts." Small, 944 F.3d at 502 (citation omitted). An individual abandons any reasonable expectation of privacy when he disclaims possession of that property. See, e.g., United States v. Davis, 782 F. App'x 246, 253 (4th Cir. 2019) (unpublished) (finding defendant abandoned truck in driveway when he said, "It's not my white box truck. I don't know anything about it."); United States v. Han, 74 F.3d 537, 544–45 (4th Cir. 1996) (finding defendant abandoned bag when he said it was not his bag); United States v. Washington, 677 F.2d 394, 395–96 (4th Cir. 1982) (finding defendant abandoned bag when he said, "It's not my bag. I don't care what you do."); United States v. Williams, 538 F.2d 549, 550 (4th Cir. 1976) (finding defendant abandoned bags when he said the bags "did not belong to him and that he had no idea to whom [they] belonged").

Tillman now argues the tent was "his tent." [D.E. 37] 6. On October 30, 2024, however, Tillman repeatedly disclaimed to law enforcement that the tent was his. Tillman said, "[T]hat's not my tent," "I ain't even been in the tent myself," and answered why he had masks "in a tent you don't live in" with "because they was in my bookbag." [D.E. 33] 6–8. These facts mirror Davis, where the defendant abandoned a truck and lost standing when he said, "It's not my white box truck." 782 F. App'x at 253.[4] Accordingly, the court rejects Tillman's argument that the tent was his.

Second, Tillman fails to show that he has standing as an overnight guest. See Minnesota v. Olson, 495 U.S. 91, 96–97 (1990); Dickerson, 655 F.2d at 561. Even if the record shows that Tillman briefly occupied the tent in the middle of the night, Tillman told law enforcement that he

---

[4] If Tillman had permission to be in another's tent, and all the recovered evidence was found inside that tent (it was not), his statements might not disclaim a possessory interest. See, e.g., United States v. Jackson, 638 F. Supp. 3d 622, 637 (E.D. Va. 2022) (noting stipulation that defendant had lawful possession of the vehicle meant stating, "That is not my vehicle," did not nullify the permission he had to use it). But permission is not what Tillman argues.

10

did not sleep there, had not been there long, and was tending the fire outside the tent and taking narcotics shortly before law enforcement arrived. See [D.E. 23] 2; [D.E. 33] 12; [D.E. 37] 11. That conduct does not suffice to make Tillman an overnight guest. See, e.g., Olson, 495 U.S. at 96–97; Dickerson, 655 F.2d at 561.

Third, Tillman argues that even if he did not reside or stay overnight in the tent, his possession and control of either the tent or his possessions suffice for standing. See [D.E. 37] 4 (citing Rose, 3 F.4th at 730). A person may have a reasonable expectation of privacy in another's residence, but the Supreme Court has made clear that not every visitor can claim that status. Mere "presen[ce] with the consent of the householder" does not suffice to show the requisite protected connection to the property. United States v. Gray, 491 F.3d 138, 145 (4th Cir. 2007) (quoting Minnesota v. Carter, 525 U.S. 83, 90 (1998)); see Green, 106 F.4th at 373–75. Tillman must establish that he is the kind of visitor who has an objectively reasonable expectation of privacy in a residence that is not his own. See Carter, 525 U.S. at 90; Green 106 F.4th at 373–74; Gray, 491 F.3d at 145. To evaluate that issue, a court considers a claimant's "degree of acceptance into the household," weighing factors such as relationship to the homeowner, visit regularity, and visit purpose. Green, 106 F.4th at 376 (cleaned up).

Tillman makes no showing on these social guest factors. Rather, he cites Rose, where the Fourth Circuit held that a defendant's subjective property interest in a residence did not suffice "on its own to warrant protection under the Fourth Amendment. Instead, a party's subjective [property] interest in [a residence] must be accompanied by reasonable, objective indicia of a possessory interest. This possessory interest does not require ownership; instead, there can be other evidence establishing possession and control." 3 F.4th at 730. For example, in United States v. Castellanos, 716 F.3d 828, 833–34 (4th Cir. 2013), the Fourth Circuit found that the defendant had no interest

11

in another's vehicle when the defendant "offered no evidence that he had any such interest, though he bore the burden of proof." Id. at 834. In Castellanos, the defendant presented no evidence that the owner "(or anyone else) had granted him permission to use the vehicle or act as his agent" or "any other right of any kind to the vehicle." Id.

In support of Tillman's social guest argument, Tillman notes that he told law enforcement where in the tent his backpack and shoes were located. Tillman then argues that this knowledge evinced an "intimate knowledge of the tent's interior." [D.E. 37] 5. The cited evidence, however, fails to show that Tillman (1) was welcomed as the kind of social guest with privacy interests or (2) sufficiently controlled the tent's interior at the time of the search. See, e.g., Castellanos, 716 F.3d at 834 (looking for evidence that defendant "established a right or [took] precautions to exclude others from the property"). Moreover, Tillman's brief presence outside the tent to tend the fire, take narcotics, and stash robbery evidence is more like Carter, where the Supreme Court found that guests had no standing because they lacked a connection to the homeowner and were "simply permitted on the premises" for a few hours to package drugs. 525 U.S. at 91. Furthermore, even if Tillman had a protected interest in the "Nike Air Jordan" backpack he claimed, law enforcement found the challenged evidence elsewhere (i.e., in a "Green Ozark" bag outside the tent and a "Pokemon" backpack atop the tent) and pursuant to the search warrant. See [D.E. 37] 21. Thus, the court rejects Tillman's argument.

Because Tillman lacks standing, the Fourth Amendment does not require the court to exclude his statements. See [D.E. 23] 5–7; [D.E. 37] 7; United States v. Salvucci, 448 U.S. 83, 85 (1980); Wong Sun v. United States, 371 U.S. 471, 487–88 (1963); United States v. Tsatenawa, No. 24-50034, 2025 WL 2556263, at *4 (5th Cir. Sept. 5, 2025) (per curiam) (unpublished); United States v. Olivares-Rangel, 458 F.3d 1104, 1117 (10th Cir. 2006); cf. United States v. Twitty, No.

12

23-4234, 2025 WL 2049059, at *14 (4th Cir. July 22, 2025) (unpublished); United States v. Taylor, 54 F.4th 795, 803 (4th Cir. 2022); Boggs v. Bair, 892 F.2d 1193, 1200 (4th Cir. 1992) (holding that defendant's fruit of the poisonous tree argument failed because car search was lawful); United States v. Gibson, 500 F.2d 854, 855 (4th Cir. 1974) (holding the fruit of the poisonous tree did not apply where defendant suffered no constitutional violation). In light of this conclusion, the court does not address the parties' arguments about inevitable discovery or spontaneous statements.

III.

In sum, the court DENIES defendant's motion to suppress [D.E. 23].

SO ORDERED. This 12 day of January, 2026.

JAMES C. DEVER III
United States District Judge